IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 13, 2026 Session

## IN RE EVALINA H.

**Appeal from the Chancery Court for Gibson County**
**No. 24922    Michael Mansfield, Chancellor**

_____

### No. W2025-00405-COA-R3-PT
_____

Petitioners attempted to terminate the parental rights of the child's biological father on the grounds of abandonment by failure to visit and support. The trial court found that neither ground had been proven but proceeded to find that had grounds for termination been proven, it would be in the child's best interest for the biological father's parental rights to be terminated. Although we affirm the trial court's finding that the biological father proved that his failure to visit was not willful, we reverse the trial court's finding as to the ground of abandonment by failure to support. We also affirm the trial court's finding that termination is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which JOHN W. MCCLARTY, P.J., E.S., and CARMA DENNIS MCGEE, JJ., joined.

Heather C. Grewe, Pinson, Tennessee, for the appellants, Mikayla D.P.C., and William A.C.

Angela Mueller, Trenton, Tennessee, for the appellee, Michael H.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case began on February 9, 2024, when Petitioners/Appellants Mikayla D.P.C. ("Mother") and her husband William A.C. ("Stepfather," and together with Mother, "Petitioners") filed a petition to terminate the parental rights of Respondent/Appellee Michael H. ("Father").[1] The petition alleged that the child, Evalina H., was born to Mother

---

[1] In cases involving the potential termination of parental rights, it is this Court's policy to remove

and Father, who were never married, in October 2016, and that the child resided with Mother for the entirety of her life.

The petition alleged that Father had not had visitation nor "made any reasonable efforts to visit" with the child since September 1, 2018. The petition noted that Father sent letters to the child from approximately April 16, 2020, to June 4, 2023, while he was imprisoned in Texas, but made no further efforts to contact Mother or the child upon his release in July 2023. The petition further alleged that Father had provided no support for the child since 2018. The petition stated that Father has Mother's contact information "including her address and social media accounts but has failed to make any effort to establish a parent-child relationship." As such, the petition asserted that Father's parental rights should be terminated on the grounds of abandonment by failure to visit and support and that termination was in the child's best interest.

Father filed a pro se response to the petition on March 11, 2024, denying that he had abandoned the child. Counsel was subsequently appointed to represent Father. Father filed an amended answer on April 4, 2024, specifically raising the affirmative defense that any failure to visit or support was not willful.

A hearing was held on December 16, 2024. Mother, Father, and Stepfather were the only witnesses. Mother's testimony began with the parties' early relationship; Mother characterized Father as an absentee even when the couple was together, choosing to drink, smoke, and play video games rather than care for or support the child. The couple moved frequently around Texas and Tennessee, relying on housing from friends and family members. During this time, Mother described episodes of physical and emotional abuse by Father. Although criminal charges were once filed against Father, and Mother obtained an order of protection against him, they soon reconciled.

A child support action appears to have been initiated by the State of Tennessee at some point. Following a December 2017 hearing, the parties entered into an agreed order in which Father was required to provide the child with health insurance should it be available through his employer and to provide Mother and the Child Support office with all information necessary for use of the insurance.[2] Father was also required to pay one-half of all reasonably necessary medical, dental, and optical expenses that were not covered by insurance. Finally, the December 2017 order stated that "CHILD SUPPORT SHALL BE RESERVED." Mother testified that she entered into the agreed order because Father promised that he would pay more to support the child, but that he never fully supported the child.

---

the full names of children and other parties, to protect their identities.

[2] The order was signed in December 2017, but was not filed until January 2018. The parties and the trial court refer to this as a December 2017 order, so we will as well.

- 2 -

The testimony showed that Father did make two deposits to Mother's bank account following the December 2017 order, but that Mother eventually closed the account around September 2018 so that Father could not do so. In a social media message between Mother and Father at that time, Mother explained that she did so "because I don't need your bribe money." Father responded that it was not bribe money, but rather "it was me keeping the promise of sending you money every check." There was no proof that Father made any other attempts to pay monetary support after September 2018.

By August or September 2018, the couple had separated for the final time when it became known that Father was being investigated and charged for sexual contact with a minor, discussed in detail *infra*.[3] September 2018 was the last time that Father had in person visitation with the child. Mother also permitted a video chat in April 2019. Although a visit was set up at a park in May 2019, after speaking with her family about Father's charges, Mother decided that she would not allow the child to attend and did not attend the visit, without informing Father that she would not attend.

Around this time, Father sent many social media private messages to Mother. She responded occasionally. In the messages, Father repeatedly asked to contact the child or to see her. Father also promised to move from Texas to Tennessee to be closer to Mother and to get a job to better provide for the family.

Father pleaded guilty to sexual contact with a minor, a second-degree felony, on November 20, 2018, and was sentenced to five years imprisonment.[4] The victim of the crime was a thirteen- or fourteen-year-old girl; her mother and father, who is Father's cousin, allowed Father to reside with the family during the time of the crime. Father admitted the sexual contact, which he described as only touching the child up to ten times over a period of two months. When asked about whether he took responsibility for the crime at trial, Father testified only that "I mean I did it. I don't know what else."[5] He also testified that the only thing that he learned from the circumstances was "Don't do it."

Father began his five-year prison sentence in approximately March 2020 and was released on parole in late July 2023. Father is listed on two sex offender registries and will be for life. At the time of trial, he was living in a half-way house and could not travel beyond Texas without his parole officer's permission.[6] Father was employed at the time of trial and had been since his release from prison, earning over $18.00 per hour. After his expenses, he had a monthly surplus of approximately $1,495.00 per month. Father placed

---

[3] Mother testified that she learned about the charges in August 2018 when the Tennessee Department of Children's Services ("DCS") came to visit her in Tennessee. DCS had no further involvement with Mother after that singular visit.

[4] The evidence showed that Father had also been arrested for handful of other crimes prior to 2018, including misdemeanor criminal trespass, criminal mischief, and evading arrest, and public intoxication.

[5] In his letters, however, Father stated that he was falsely accused.

[6] Father testified that this limitation would be removed on March 1, 2025.

the child on his employer-provided insurance when he was permitted to do so.

Mother and Father agreed that he sent the child approximately thirty letters during his period of incarceration. Although addressed to the child, the letters often contained information that was not age-appropriate. Father spoke in the letters about filing for custody prior to his release; there is no dispute that he did not file any custody action during this time. Father also spoke about how Mother hates him, the rise of COVID-19 cases in children, an order of protection case against him, the criminal allegations against him, whether his relationship with Mother was truly over, and the fact that he had been prescribed anti-depressants. Father also apologized for not changing despite promises to do so. Father testified that he did not expect the child to read the letters when he sent them, but only later when she was older as a record of this time in their lives. Father once provided contact information for his family members so that the child could keep in touch with them.

Once Father was released from incarceration, he stopped sending letters and thereafter attempted to reach out to Mother strictly via social media private messages. Father explained that he switched media because he felt that after sending thirty letters with no response, letters "felt kind of futile." In many of the social media messages, Father discussed his efforts to provide health insurance for the child consistent with the December 2017 child support order; he also provided Mother with copies of the relevant health insurance cards. In other messages, Father asked Mother to contact him. Father admitted that he was not permitted to use social media as a condition of his parole but testified that this fact was only recently explained to him. Mother testified that she did not receive the messages because she had at one point blocked Father on social media, given his violence toward her and his criminal activity. She explained that due to the domestic violence issues and Father's criminal charges, she did not want to speak with Father. When asked, however, if she had received Father's social media messages, would she have responded, Mother explained "[p]robably not" because she had made up her mind not to allow the child to have contact with Father.

Father testified that after receiving no response from Mother on social media, he eventually decided to file a legal custody action against Mother. He testified that first he had to save up to "afford a lawyer," but that he set up a meeting with an attorney in Dyer County, Tennessee prior to being served the termination petition. Father produced a receipt for a consultation with the attorney dated February 21, 2024; there is no dispute that Father was served with the termination petition on February 23, 2024. Father's actual meeting with the attorney occurred after he was served with the petition.

Petitioners each testified that the child is bonded to Stepfather, whom the child views as her "daddy." The child has one stepsibling whom Mother has adopted, as well as one half-sibling. The girls have a typical close sibling relationship. Mother testified that while Father was removed from the child's life due to his own criminal acts, Stepfather is the father-figure who attends the child's events, who taught her to ride a bike, and who

maintains stability and financial security for her. Mother testified to her understanding that Father would not be able to attend many of the child's events due to his status as a sex offender. The child is also bonded to Stepfather's extended family.

The trial court entered a detailed and thorough order denying the petition to terminate parental rights on February 20, 2025. Relevant to this appeal, the trial court found as follows:

> 4. The "relevant time period" for a determination whether [Father] "abandoned" his child as defined in Tenn. Code Ann. § 36-1-102 by willfully failing to visit and/or support the child for purposes of termination pursuant to Tenn. Code Ann. § 36-1-113(g)(1) is the four-month period immediately preceding the filing of a petition for termination of their parental rights. In this case, Petitioners' petition was filed on February 9, 2024, such that the "relevant time period" in this case is October 9, 2023, through February 9, 2024.
> 5. [Father] currently lives in a halfway house in Texas, in which he will continue to live until the terms of his current parole change in March 2025. He has been gainfully employed since being released from prison in June 2023 and is currently working at a job at which he expects to be promoted to supervisor. He has had the child on his employer-provided health insurance at all times that he has been eligible for that since he was released from prison but has provided no other financial support for his child during that time.
> 6. The Dyer County Chancery Court entered an order on December 21, 2017, which order memorialized [] Mother and [Father's] agreement concerning child support for the child. Such order did not address issues of visitation and has not been modified. No other court orders have been entered with regard to custody, visitation, or support for the minor child at issue in this case.
> 7. [Father] acknowledged that he did not visit with the Child during the relevant time period. Nevertheless, the Court finds that [Father] has established the affirmative defense of lack of willfulness of such failure to visit based upon Mother's refusal to cooperate with his efforts to contact her to coordinate visitation with the child after his release from prison, the restrictions upon his activities resulting from his parole conditions, and the futility of Father making any effort other than filing a court proceeding in Tennessee, which he could not reasonably afford to do, prevented him from coordinating visitation with the child during that period.
> 8. The proof at trial showed that Petitioners do not approve of [Father] (a valid concern given [Father's] history) and did not attempt to foster a relationship between [Father] and the Child; on the contrary, the proof at the hearing showed that the Petitioners made a conscious decision to not foster such a relationship and cut off lines of communication with [Father] that could have been used to establish such a relationship with the child.

9. When [] Mother failed to respond to [Father's] attempted communications, [Father] decided to attempt to save money and hire a lawyer to get visitation with the child. He met with a lawyer in Dyersburg, Tennessee, in an effort to start the court process to get visitation but could not afford to proceed at that time. He later learned that the instant petition had been filed against him and actively responded to and defended the same, ultimately through court-appointed counsel. The Court finds that [Father's] testimony in that regard was credible.

The trial court therefore found that Father met his burden to demonstrate that his failure to visit was not willful. The trial court further found that Father complied with the Dyer County Chancery Court's order regarding support and that Father had met his legal obligation to support the child.

Nevertheless, the trial court noted that it would proceed to consider the child's best interest in anticipation of a possible appeal. After considering the relevant best interest factors, the trial court found that nearly all of the factors weighed in favor of terminating Father's parental rights and that Petitioners had therefore presented clear and convincing evidence that termination was in the child's best interest. Still, because no grounds for termination were proven, the trial court ultimately denied the termination petition.

## II. ISSUES PRESENTED

On appeal, Petitioners take issue with the trial court's ruling that they proved no grounds for termination. They further assert that the trial court was correct to find that termination of Father's parental rights is in the child's best interest. Father argues that the trial court correctly determined that no grounds for termination existed and, as a result, there is no need to consider the child's best interest.

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (quotation marks and citations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with

a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court has previously explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200

(Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

## IV. ANALYSIS

### A. Grounds

Two grounds are at issue in this case: abandonment by failure to visit and abandonment by failure to support. Parental rights may be terminated when "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]" Tenn. Code Ann. § 36-1-113(g)(1). As relevant here, Tennessee Code Annotated section 36-1-102 defines abandonment as follows:

> If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i)(a).[7]

A failure to visit involves "the failure, for the applicable time period, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant time period[.]" Tenn. Code Ann. § 36-1-102(1)(E). A failure to support involves "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). When the provided support, "under the circumstances of the individual case, is insignificant given the parent's means[,]" it is considered token. Tenn. Code Ann. § 36-1-102(1)(C).

A parent may raise as an affirmative defense that the failure to visit or support was not willful. Tenn. Code Ann. § 36-1-102(1)(I). In that case, the parent bears the burden of proving the absence of willfulness by a preponderance of the evidence. *Id.* Willfulness in

---

[7] Throughout this Opinion, we apply the version of the relevant statutes that were in effect at the time the petition was filed.

terms of parental rights "does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will." *In re Audrey S.*, 182 S.W.3d at 863 (citations omitted).

The trial court found that although Father did not visit the child in the four months preceding the filing of the termination petition, his failure to do so was not willful.[8] In particular, the trial court cited Mother's refusal to respond to Father's communications concerning the child over the years, Mother's cutting off of certain lines of communication with Father, and Father's financial situation preventing him from filing a court proceeding against Mother.

On appeal, Petitioners assert that Father had the ability to visit the child during the relevant period because he simply needed to ask his parole officer for permission. And Father did gain permission to meet with a local lawyer in February 2024. Moreover, they contend that "Father could have asked Mother, Step-Father, his own [m]other (which had contact with Mother and saw the minor child), or any other related party to request to see the minor child, yet he failed to do so." Petitioners also take issue with the fact that Father sent no letters to their home after his release from incarceration in July 2023. According to Petitioners, while Mother did block Father on social media, she did not block him from sending a letter to her home requesting visitation. Finally, Petitioners note that Father came to Tennessee on multiple occasions in 2019 but did not seek to visit with the child during these visits.

After our review, we conclude that the evidence supports the trial court's findings on this issue.[9] As an initial matter, while Petitioners' petition to terminate Father's parental rights specifically alleged that Father "failed to make any effort to establish a parent-child relationship" through either letters or social media messages during the four-month period, this allegation was not supported by the proof eventually presented at trial. Rather, the proof contains several social media messages from Father to Mother during the four-month period. While Father did not specifically ask for visitation with the child during these

---

[8] The trial court calculated the four-month period incorrectly. Here, the petition was filed on February 9, 2024, so the four-month period ran from October 7, 2023 to February 8, 2024, the day before the petition was filed. This error is harmless under the facts of this case. *See generally In re Austin W.*, No. M2020-01315-COA-R3-PT, 2021 WL 5105148, at *7 (Tenn. Ct. App. Nov. 3, 2021) ("[A] trial court's identification of the wrong four-month period is not always reversible error.").

[9] There has been some dispute in this Court concerning the proper standard of review when the trial court makes findings as to a parent's lack of willfulness. One camp cites law originating prior to the 2018 change in the termination statutes designating the lack of willfulness as an affirmative defense rather than an element of abandonment and holds that lack of willfulness remains an issue of law subject to a de novo standard of review. Another camp asserts that the 2018 amendment providing that the parent must prove lack of willfulness by a preponderance of evidence establishes that this issue is now an issue of fact and the trial court's findings thereon are therefore subject to a presumption of correctness. *See generally In re Preston H.*, No. M2022-00786-COA-R3-PT, 2023 WL 6793215 (Tenn. Ct. App. Oct. 13, 2023) (McBrayer, J., concurring). In this case, the trial court's ruling may be upheld under either standard.

messages, he repeatedly asked to talk with Mother and informed her that he had placed the child on his work-provided health insurance. It does appear that Mother did not receive these messages due to having blocked Father on social media at some point. Petitioners therefore assert that Father should have sent a letter to Mother seeking visitation.

But the proof also shows that Father's letters to the child and Mother while he was incarcerated went completely unanswered.[10] Although these letters were sent prior to the relevant four-month period, they are relevant in determining the willfulness of Father's actions. *See In re Adoption of Marissa O.R.*, No. W2013-01733-COA-R3-PT, 2014 WL 2475574, at *14 n.12 (Tenn. Ct. App. May 30, 2014) ("[C]ourts often must consider the parent's actions *outside* the four-month period in order to assess the willfulness of the parent's actions *within* the pivotal four-month period, as 'part of the constellation of facts that must be considered to assess willfulness.'" (quoting *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013))). Specifically, the proof shows that Father sent the child over thirty letters while he was incarcerated and never received a response of any kind from Mother. As a result, Father believed that mailing letters to Mother was futile, which the trial court appears to have credited. Moreover, in the years before his incarceration, he also sent dozens of mostly unanswered messages to Mother, many of which specifically requested visitation with the child. When Mother did sporadically respond, she made it clear that she would not allow Father access to the child. And Mother unilaterally suspended any visitation with the child by simply refusing to show up for the last scheduled visit. Importantly, Mother also admitted at trial that even if she had received contact from Father, she likely would not have responded.

Regarding willfulness and failure to visit, our Supreme Court has explained,

We have held that when a parent attempts to visit his child but is "thwarted by the acts of others," the failure to visit is not willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *see In re F.R.R., III*, 193 S.W.3d [528,] 530 [(Tenn. 2006)]. Thus, a parent's failure to visit is willful when it is "the product of free will, rather than coercion." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).
. . . .

. . . A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child. *In re Audrey S.*, 182 S.W.3d at 864.

---

[10] The letters were sent to the child but clearly discussed adult matters that were directed toward Mother. Obviously, Father has not always exercised best practices.

*In re M.L.P.*, 281 S.W.3d 387, 392–93 (Tenn. 2009). Thus, Tennessee law is clear that thwarting visitation may result in the finding of a lack of willfulness. Indeed, our courts have often held that a significant restraint or interference with a parent's efforts to visit or support a child can occur by: "(1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting a parent's efforts to visit the child." *In re S.M.*, 149 S.W.3d 632, 642 n.18 (Tenn. Ct. App. 2004) (citations omitted).

In this case, Mother rebuffed Father's sustained efforts to maintain a relationship with the child for a period of years. Mother cut off contact with Father through some channels but was not responsive when he used the channels that she now asserts Father should have utilized. Moreover, she admitted that even if she had received his communications after his release from prison, she would not have responded.[11]

Still, Petitioners take issue with Father's delay of over six months between his release from incarceration and his decision to seek legal counsel to gain access to the child. Certainly, when enmity exists between parents or a parent and the custodian of a child, a parent who seeks redress through the courts has likely not willfully abandoned his or her child. *See In re Adoption of A.M.H.*, 215 S.W.3d at 810 ("Where, as here, the parents' visits with their child have resulted in enmity between the parties and where the parents redirect their efforts at maintaining a parent-child relationship to the courts the evidence does not support a 'willful failure to visit' as a ground for abandonment."). But Father testified that he sought the assistance of an attorney before he learned of the petition to terminate his parental rights and that his delay was the result of financial issues. The trial court explicitly found that this explanation was credible. And we give great weight to the trial court's credibility findings. *See Fritts v. Safety Nat. Cas. Corp.*, 163 S.W.3d 673, 678 (Tenn. 2005) ("When issues of credibility of witnesses and the weight to be given their in-court testimony are before the reviewing court, considerable deference must be accorded to the factual findings of the trial court.").

Certainly, we share Petitioners concerns with Father's decision to commit a despicable crime against a child. But Petitioners cite no legal authority to support Mother's decision to, on the one hand, completely block Father's access to the child, and then on the other, charge him with a willful failure to visit the child. We have previously held that the ground of failure to visit could not be sustained under similar circumstances. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *8 (Tenn. Ct. App. July 22, 2020) ("Here, Mother essentially uses her legal status as the sole custodian of the child

---

[11] Petitioners assert in their brief that Father did not attempt to see the child when he was in Tennessee on a few occasions both before and after his incarceration. Without prior permission or communication from Mother, it was reasonable for Father to not simply show up to Mother's home on the occasions he was in Tennessee demanding visitation.

- 11 -

both as shield, preventing her from acquiescing to Father's repeated requests for visitation in the absence of a court order, and as a sword, to demonstrate a ground for termination of Father's parental rights due to his lack of visitation. While Mother certainly had the right to insist upon formal visitation via court order, Tennessee law makes clear that a parent cannot significantly interfere with the noncustodial parent's visitation and still rely on the ground of failure to visit to terminate parental rights."). While Mother may have done so in an effort to protect her child, the evidence nevertheless shows that Mother blocked Father's access to the child in a sustained manner over a number of years. *See **In re Alex B.T.***, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *8 (Tenn. Ct. App. Nov. 15, 2011) ("In this case, given the trial court's credibility findings in favor of Mother and Grandmother, the evidence shows that Mother made numerous attempts to call and visit the child and her efforts to maintain a parental relationship were frustrated by the Appellants' efforts to limit her contact with the child."). Moreover, while Mother points to other channels that Father could have used to contact her, she testified that no matter how he contacted her, she likely would not have permitted him to have contact with the child. We therefore conclude that the trial court did not err in finding that Father proved the defense of lack of willfulness by a preponderance of the evidence in relation to the ground of abandonment by failure to visit.

The trial court also found that Father had not failed to support the child during the relevant four-month period. Specifically, the trial court found that by order of December 21, 2017, Mother and Father agreed that Father's only obligation to support the child was to place the child on his employer-provided health insurance, but that child support was reserved. And the trial court found that Father had complied with this order by placing the child on his employer provided insurance "at all times that he has been eligible for that since he was released from prison[.]"

We thus turn to the order at issue, which reflects that by "agreement between the parties" Father was required to provide health insurance for the child "if and when it [became] available through any employer at a reasonable cost" plus one-half of all reasonably necessary medical, dental, and optical expenses not covered by insurance. Father was also required to provide all paperwork, policy information, and forms to Mother and/or the Child Support office within thirty days. As for monetary support, the order provided as follows: "CHILD SUPPORT SHALL BE RESERVED."

As we perceive it, the trial court ruled that because Father had placed the child on his health insurance when available following his release from prison, he met all his legal obligations under the agreed order. Respectfully, we cannot agree. In our view, this case is highly analogous to ***In re Kiara C.***, No. E2013-02066-COA-R3-PT, 2014 WL 2993845 (Tenn. Ct. App. June 30, 2014). In that case, the parents of the child were divorced in Illinois in 2004. *Id.* at *1. The divorce order provided that the father was to "assume full responsibility for all future necessary medical, dental, orthodont[ic], prescription drug and optical expenses incurred by or on behalf of" the child but reserved the issue of child

support. *Id.*

The mother and her new husband eventually filed a petition to terminate the father's parental rights, citing as one ground the father's failure to pay financial support. The father countered that his failure to pay support was not willful because the Illinois court order waived his obligation to pay financial support beyond medical expenses. But this Court disagreed, explaining:

> This argument is grounded in a misreading of the divorce decree, in which the [prior] court *reserved* rather than waived the issue of child support. [The m]other testified at trial that she did not waive [the biological f]ather's duty to pay child support. Moreover, whether [the bioloigcal f]ather had ever been ordered by a court to pay child support or advised of his duty to do so is irrelevant.

*Id.* at *8. The Court of Appeals based its conclusion on the well-settled principle that a parent's duty to support his or her child exists regardless of an order from a court. Tennessee Code Annotated section 36-1-102(1)(H) states that "every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Thus, a parent's obligation to support his or her child is not contingent upon a court order requiring the parent to pay support. *See e.g.*, **In re Shandajha A. G.**, No. E2012-02579-COA-R3-PT, 2013 WL 3787594 (Tenn. Ct. App. July 17, 2013). Thus, the fact that a prior court order reserved the calculation of child support does not excuse a parent from their statutory duty to provide more than token support. *See* **In re Brookelyn W.**, No. W2014-00850-COA-R3-PT, 2015 WL 1383755, at *11 (Tenn. Ct. App. Mar. 24, 2015) ("Thus, the fact that the Tipton County Juvenile Court order did not specifically address support is not an excuse for Father's failure to support his child." (citing **In re Kiara C.**, 2014 WL 2993845, at *8)). *But see* **In re Nathaniel D.**, No. E2025-00081-COA-R3-PT, 2025 WL 2682865, at *1 (Tenn. Ct. App. Sept. 19, 2025) (split opinion in which the majority declined to follow **In re Kiara C.**, finding it distinguishable) (uncitable Memorandum Opinion), *perm. app. granted*, (Tenn. Feb. 26, 2026).

The same is essentially true in this case. Here, the 2017 order did not waive Father's child support obligation; it merely reserved calculation of child support for a later date. And the proof at trial indicates that the parties never intended that this order constitute a waiver of child support. Mother testified that she agreed to the order because Father promised that he would contribute more to the support of the family. Father admitted in a text message to Mother that he "promise[d] [to] send[] [Mother] money every check." And Father did attempt to support the child for a time following the entry of the December 2017 order until Mother rebuffed his efforts by closing the bank account where he deposited the support and informing him that she did not want his "bribe money." So then, the evidence simply does not support any finding that Father was excused from paying additional

monetary support as a result of the 2017 order.

Obviously, the proof does show that Mother did thwart some of Father's efforts to support the child in 2018. *See In re S.M.*, 149 S.W.3d at 642 n.18. And there is no dispute that Mother never reached out to Father to seek any support. But this Court has indicated that a custodial parent's failure to seek support from the non-custodial parent is insufficient to excuse a non-custodial parent's failure to support a child. *See David A. v. Wand T.*, No. M2013-01327-COA-R3-PT, 2014 WL 644721, at *8 (Tenn. Ct. App. 2014); *In re Jacobe M.J.*, 434 S.W.3d 565 (Tenn. Ct. App. 2013) (discussed in detail, *infra*). Moreover, we have held that failure to support "is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, . . . or amounts to a significant restraint of or interference with the parent's efforts to support . . . the child." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citing *In re Adoption of Lybrand*, 329 Ark. 163, 946 S.W.2d 946, 950 (1997); *In re Serre*, 77 Ohio Misc. 2d 29, 665 N.E.2d 1185, 1189 (1996); *Panter v. Ash*, 177 Or. App. 589, 33 P.3d 1028, 1031 (2001)).

In this case, Father presented no proof that he made any attempt to support the child monetarily during the four-month period or for several years prior thereto. The proof shows that Father has considerable surplus income each month of nearly $1,500.00. Moreover, Father was well aware of Mother's address, as he used it to send Mother over thirty letters while incarcerated. But despite this surplus and this knowledge of how to send support, Father made absolutely no effort to send monetary support for the child during the relevant period. Nor did any of his communications to Mother inquire about the need for monetary support or unpaid medical expenses. *Cf. In re Kiara C.*, 2014 WL 2993845, at *9 ("Insomuch as Father is presumed to have knowledge of the Child's need for financial support, we determine that he also should have known that the Child, like all children, would incur some health expenses over the course of ten years.").

Obviously, this holding is somewhat at odds with our decision that despite knowing Mother's address, Father's failure to request visitation through a letter was not evidence of willfulness. But the evidence does not indicate that Father ever attempted to send support to Mother by mail; as such, Mother never thwarted any efforts to support the child in that manner. And Father's social media messages never included any mention of monetary support. Moreover, Mother's decision to thwart Father's effort to pay support via her bank account a single time years before the four-month period clearly does not equate to her sustained effort to thwart Father's contact with the child over a period of several years. If Father had attempted even a single time in the four-month period to send support via mail to Mother that she refused to accept, this result may have been different. But Father simply made no effort to do that, believing that his only obligation was to place the child on his employer-provided insurance. But his obligation to support his child went beyond that meager offering. Thus, while it does appear that Father placed the child on his health insurance during the relevant time, we conclude that this effort was merely token, given

his means. *See* Tenn. Code Ann. § 36-1-102(1)(C). As a result, the trial court erred in finding that Petitioners did not prove this ground for termination.

## B. Best Interest

Because at least one ground for termination exists, we proceed to consider the trial court's findings as to the child's best interests. Tenn. Code Ann. § 36-1-113(c); ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). The factors that courts should consider in ascertaining the best interest of children include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of

- 15 -

circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (directing the court to "consider all relevant and child-centered factors applicable to the particular case before the court").

"This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667 (citations omitted). As such, determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* (citing *White*, 171 S.W.3d at 194). In considering the statutory factors, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 878).

Here, the trial court found fourteen factors—(A), (B), (C), (D), (E), (H), (I), (J), (N), (O), (P), (R), (S), and (T)—weighed in favor of termination and five factors—(F), (G), (K),

- 16 -

(M), and (Q)—weighed against termination.[12] As "there exists a significant overlap between some factors," our review of the child's best interest is "based on the overarching themes within the list of twenty factors." ***In re Chayson D.***, 720 S.W.3d 123, 144 (Tenn. Ct. App. 2023).[13]

We turn first to those factors related to the child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's wellbeing), (D) (involving the security of the parent-child attachments), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), (I) (involving the child's relationships with others), (T) (involving the effect of the parent's mental and emotional fitness on the child). The trial court found that each of these factors favored termination. We generally agree. Although it is true that Mother thwarted Father's ability to be present in the child's life, his own criminal acts were the true catalyst for all that came after. And even before Mother chose to terminate the relationship, Father was never a source of stability in the child's life. Moreover, regardless of who is at fault for the lack of parent-child relationship, there can be no dispute that Father and the child are little more than strangers, while the child is closely bonded to Mother and Stepfather, whom the child views as her father. A change in caretakers would therefore be highly detrimental to the child, particularly given Father's status as a sex offender and his decision to engage in a deplorable criminal act. As such, factors (A), (B), (D), (H), (I), and (T) indeed favor termination.

Next, we address those factors involving the physical environment of the child and the parent. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). The trial court found that some of these factors did not weigh in favor of termination essentially because the child had never been in Father's home, while some favored termination. We agree. Although the lack of contact between Father and the child means that the child has never known fear from Father, Mother testified that she was the victim of Father's violence during the relationship and Father's current living situation is unsuitable for a child. Moreover, his current circumstances are the result of his own decision to engage in repeated sexual violence against a child who was not too much older than his own daughter. Father's nonchalance about his crime and the lessons that he learned from it are also concerning. As a result, while factors (F) and (G) do not favor termination,

---

[12] The trial court found that factor (L), concerning the reasonable efforts of the Department of Children's Services, was inapplicable.

[13] Father does not specifically take issue with any of the trial court's best interest findings, relying on his argument that Petitioners failed to prove any grounds for termination. Petitioners also do not address the best interest factors in detail. We will nevertheless consider whether clear and convincing evidence supports the termination of Father's parental rights.

- 17 -

factors (N), (O), (Q), and (R) heavily favor termination.

We turn to those factors concerning the efforts made by the parent. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (M) (involving the parent's sense of urgency), (P) (involving the parent's understanding of the child's basic needs). Again, the trial court found that factors (K) and (M) did not favor termination, but that factors (C), (J), and (P) did. The proof supports the trial court's findings. Although the trial court credited Father's testimony that he was seeking legal assistance prior to the filing of the termination petition and his testimony concerning his employment, the proof also shows that Father has never been a true caregiver for the child, even before Mother cut him out of the child's life. And again, his own choices removed him from the child's life for several years, regardless of Mother's decision to cut off contact. So we agree that factors (C), (J), and (P) support termination.

The final factor involves "[w]hether the parent has consistently provided more than token support for the child[.]" Tenn. Code Ann. § 36-1-113(i)(S). As noted above, the proof indicates that Father made no efforts to provide more than token support for the child past September 2018, and according to Mother, he never provided more than token support. As such, this factor weighs in favor of termination.

Thus, the clear majority of factors favor termination in this case. Moreover, this case presents a clear picture that termination is in the child's best interest. On the one hand, the child is in a safe and secure home, with the people that she views as her parents. On the other hand, Father is living in a half-way house in Texas due to having committed a sexual crime against a child that will require he be on the sex-offender registry for life. Although Father did attempt to maintain some contact with the child, his letters were not always age-appropriate and therefore could not be given to the child. And while Mother did thwart his visitation for some time, it was his own criminal acts that prompted Mother to do so and which kept him out of the child's life for several years irrespective of Mother's interference. We commend Father on the progress he appears to have made since his release from incarceration. That stability, however, does not change the fact that it is in the child's best interest that Father's parental rights be terminated. We therefore affirm the trial court's finding that termination is in the child's best interest.

## V. CONCLUSION

The judgment of the Gibson County Chancery Court is affirmed in part, reversed in part, and remanded for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellee, Michael H., for which execution may issue if necessary.

- 18 -

_s/ J. Steven Stafford_

J. STEVEN STAFFORD, JUDGE